*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PLUMMER, Minors.

UNPUBLISHED
December 23, 2024
9:12 AM

No. 370126
Branch Circuit Court
Family Division
LC No. 22-006471-NA

Before: GARRETT, P.J., and RICK and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to the minor children, KP, RP, IP, and PP, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), (j) (reasonable likelihood of harm if returned to parent), and (k)(*ii*) (parent sexually abused child or child's sibling). We affirm.

## I. BACKGROUND

This case returns to this Court following a remand to the trial court in December 2023. See *In re Plummer*, unpublished per curiam opinion of the Court of Appeals, issued December 28, 2023 (Docket No. 366380). This Court previously provided the underlying background and procedural facts of this case, see *id.* at 1-9, but to summarize for the purposes of this appeal, in mid-September 2022, the Department of Health and Human Services (DHHS) received allegations that respondent sexually abused KP. Immediately thereafter, DHHS filed a petition to remove the children from respondent's care and to terminate respondent's parental rights to each of the children at initial disposition. The children were removed from respondent's care the same day

-1-

that the petition was filed[1] and, following a termination hearing in May 2023, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(j) and (k)(*ii*).

Respondent appealed, and this Court vacated the termination order and remanded to the trial court for respondent to be afforded reasonable efforts toward reunification with the children because "the trial court failed to recite the clear, direct, weighty and convincing evidence that respondent-father committed these [alleged sexual] acts and, as a consequence, was not entitled to reasonable efforts to reunify with his children."[2] *Id*. at 13. For the same reasons, this Court concluded that the trial court erred by finding that clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(j) and (k)(*ii*). *Id*. at 9-12. This Court reasoned that the trial court had "ignored other evidence that conflicted with and undermined the evidence pointing to respondent-father as the abuser, specifically, testimony from the mother, her brother (Marcus), and respondent-father suggest[ing] that the grandfather coached KP into making the allegations against respondent-father and that someone other than respondent-father may have sexually abused KP." *Id*. at 10. More specifically, "[t]he trial court did not address whether or how any of this evidence affected its credibility determinations or whether it otherwise affected its findings related to" subsections (j) and (k)(*ii*). *Id*. at 11. This Court stressed that it did "not express a position on whether the evidence ultimately support[ed] termination" but "simply conclude[d] that the trial court could not have come to a proper determination without evaluating *all* of the evidence—including the evidence related to the grandfather—and explaining that to better facilitate appellate review." *Id*. at 11-12.

On remand, the trial court adopted a case service plan, which continued the services that had been provided to respondent since December 2022, including individual therapy, parenting classes, employment services, and housing services. In February 2024, DHHS filed a supplemental petition to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), (j), and (k)(*ii*). At the termination hearing in March 2024, caseworkers involved in the case and three trauma assessment clinicians from a social services nonprofit organization testified about the children. The clinicians testified that KP and IP were diagnosed with post-traumatic stress disorder (PTSD) and PP was diagnosed with unspecified trauma- and stressor-related disorder, and all four children were diagnosed with various developmental delays and had special needs. The clinicians and caseworkers also testified that all four children demonstrated food insecurity in their foster placements.[3] For instance, KP hoarded and hid food in her room and ate breakfast and lunch both at home and at school; RP requested snacks immediately before and after meals, waited at the table for food, and paced when food was not ready when she expected it to be; and IP and PP constantly requested snacks and indicated that they were fearful that they would not receive them. A former

---

[1] The trial court authorized the petition in early October 2022 and, following an adjudication hearing in March 2023, exercised jurisdiction over the children.

[2] The children's mother voluntarily relinquished her parental rights to the children and is not involved in this appeal.

[3] When placed in nonrelative foster homes, KP and RP were placed together in one home and IP and PP were placed together in another, so one caseworker was assigned to KP and RP and another was assigned to IP and PP.

caseworker testified that respondent had reported to her that he had locked KP and RP in their bedroom at night to prevent them from taking food from the kitchen. A caseworker also testified that both KP and RP demonstrated sexual behaviors that were inappropriate for children their age, noting that RP's behavior was "fairly new" and had "increased [in severity] over time." One clinician testified that KP's score on a behavior inventory tool used to identify atypical sexual behaviors in children suggested that she had been sexually abused, and KP reported to one clinician that respondent had touched her private parts. KP also explained to DHHS caseworkers, case managers, and supervisors that respondent taught her how to "deep-throat" and used various foods to demonstrate what respondent taught her to perform on him. None of the children ever asked about respondent, and KP reported to multiple clinicians that she did not want to see respondent.

Regarding respondent, a caseworker testified that a parent agency treatment plan (PATP) had been created for and provided to respondent in December 2022 and that respondent had been offered services to address his barriers to reunification as detailed in that plan, but respondent minimally participated in those services throughout the case and had not communicated with the caseworker since May 2023. The psychologist who conducted respondent's psychological evaluation in March 2023 testified that respondent did not complete all the recommended tests and, of the tests he did complete, he often minimized serious issues and demonstrated difficulty accepting personal responsibility for his actions, particularly as it related to DHHS's involvement in his and his children's lives. A caseworker testified that, at the time of the termination hearing, respondent was still determining a treatment plan with his therapist and that respondent had yet to engage in any therapy sessions. Respondent testified that he chose not to attend therapy immediately as recommended because his grandfather had recently passed away and he had "a lot of things going on." Respondent had been living in a one-bedroom motel room since mid-February 2023, which he acknowledged was inappropriate housing for the children. Respondent also acknowledged that he had not participated in any parenting classes and that the classes still needed to be arranged. The caseworker testified that she was concerned about respondent's ability to financially support himself and the children because he only worked part time, he relied on his family members for money and food, and although he was able to obtain full-time employment, he could not maintain it for any meaningful period of time. Respondent acknowledged that he had received regular financial assistance and a car from his family but testified that his part-time job recently became full time and that he had applied for Indiana state-assisted health insurance, food stamps, and housing two weeks before the termination hearing.

At the close of proofs, the trial court found that DHHS had established grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), (j), and (k)(*ii*) by clear and convincing evidence. The trial court found that, based on KP's continued inappropriate sexual behavior, additional psychological evaluations, and recent reports detailing respondent's sexual abuse, respondent had sexually abused KP. The court stated that its findings regarding the sexual abuse largely hinged on witness credibility, noting that it did not find the testimony of respondent or his brother-in-law to be credible and, in light of the consistency in KP's allegations of sexual abuse against respondent throughout the entire case, did not "find that there [was] any credence that Grandfather" or "anybody else did this[.]" The trial court also found that there was no reasonable likelihood that respondent would rectify the conditions that led to adjudication within a reasonable time considering the children's young ages because respondent had signed a PATP in December 2022 but had minimally participated in the services offered to him since then and sexual abuse, mental health, parenting skills, appropriate housing, and stable employment all remained barriers to

reunification. The court noted that the parties were "in a different position" than what they were in at the first termination hearing "because [respondent] has had time to rectify the situation" but that, other than completing his psychological evaluation, respondent made no effort to engage in services until approximately two weeks before the termination hearing. The trial court further found that respondent was financially able to provide for the children but failed to do so and was not reasonably likely to do so in the future, noting that respondent did not "have any physical disabilities" and "certainly can work and . . . has worked" but was in the same poor financial position as he was at the start of the case. And, for the same reasons already mentioned, the trial court found that the children faced a reasonable likelihood of harm if returned to respondent.

The trial court also found that, for many of the same reasons, DHHS had established by a preponderance of the evidence that termination was in the children's best interests due to the children's need for safety, security, and stability.[4] The court acknowledged that the children ranged from ages four to ten years old and had differing special needs but that, given the evidence presented, respondent could not provide for any of their needs. The court also noted that all of the children "hoard[ed] food" and demonstrated food insecurity, two of the children were "acting out sexually," and testimony indicated that all of "these children have been traumatized" in some way. The court emphasized that there was a minimal bond between respondent and the children, noting that none of the children ever asked about respondent. The court also emphasized that all of the children were in preadoptive homes and that, given the evidence presented in this case and the children's need for safety, security, and stability, "it would be in the best interests for them to be able to achieve that[.]" The court concluded: "I'll state it once again: I did not find that there was any evidence that would have caused the Court to find contrary in my previous decision, because I did not believe those witnesses were credible or reliable, or it was anything that would rise to the level of reaching a different conclusion." The trial court thereafter issued an order terminating respondent's parental rights to the children.

This appeal followed.

## II. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence and that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*. at 41. "[W]hether termination of parental rights is in the best interests of the

---

[4] When making its best-interests findings, the court emphasized that it found well beyond a preponderance of the evidence that termination to be in the children's best interests, stating: "The Court, when looking at the best interest factors, does find by a preponderance of the evidence, which would be the standard—I even find beyond that, clear and convincing or beyond a reasonable doubt, that these children . . . need safety, they need security, and they need stability."

child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court gives deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

## III. STATUTORY GROUNDS

Respondent argues that the trial court clearly erred by finding statutory grounds for termination of his parental rights. On appeal, however, respondent has raised no challenge to the trial court's findings regarding MCL 712A.19b(3)(c)(*i*), (j), and (k)(*ii*).[5] Instead, respondent argues only that the trial court clearly erred by finding that DHHS established statutory grounds for termination under subsection (g) by clear and convincing evidence. Because only one statutory ground must be established by clear and convincing evidence to terminate parental rights, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), respondent's failure to challenge the trial court's findings under subsections (c)(*i*), (j), and (k)(*ii*) precludes appellate relief for this issue, and we decline to address it further, see *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo Minors*, 462 Mich 341, 353 n 10; 612 NW2d 407 (2000).

## IV. BEST INTERESTS

Respondent also argues that the trial court clearly erred by finding that termination was in the children's best interests. We disagree.

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child[]'s best interests," and it should consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case

---

[5] Nor, for that matter, do we see grounds in the record for such a challenge. For instance, given the testimony concerning KP's allegations of sexual abuse against respondent and the testimony that respondent did not participate in any parenting classes, largely did not participate in individual mental-health services, did not obtain appropriate housing, did not maintain full-time employment for any meaningful period of time, and did not apply for state-assisted health insurance, food stamps, and housing until two weeks before the termination hearing, there was ample evidence in the record to support the trial court's finding that there was "no reasonable likelihood that the conditions" that led to adjudication—i.e., sexual abuse, lack of parenting skills, mental-health issues, and employment and housing instability—would "be rectified within a reasonable time considering the child[ren]'s age[s]." MCL 712A.19b(3)(c)(*i*); see also *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009) (holding that termination under subdivision (c)(*i*) is appropriate when "the totality of the evidence" supports a finding that the parent "had not accomplished any meaningful change in the conditions" that led to adjudication).

service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *Id*. at 714. "The trial court may also consider how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks, citation, and alteration omitted). The trial court must also determine each child's interests individually, and "if the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *White*, 303 Mich App at 715-716.

On appeal, respondent only challenges the trial court's findings regarding the children's best interests on the basis that the court did not adequately consider the needs of each child individually. The record, however, belies that claim. In making its findings, the trial court acknowledged that KP, RP, IP, and PP were ages ten, eight, six, and four, respectively, and that each child had differing developmental delays and various special needs, but the children were nonetheless similarly situated in many respects. The court found—and the record supports—that respondent could not provide for any of the children's needs and that each child's need for safety, security, and stability outweighed any bond with respondent. Testimony at the termination hearing established that none of the children ever asked about respondent, and KP specifically reported that she no longer wished to see respondent. Testimony also established that none of the children received the specialized treatment and therapy that they each needed until they were placed in their preadoptive foster homes, and respondent admitted that he had not participated in any parenting classes meant to assist him in caring for any of his children's needs. Testimony also showed that all four children demonstrated significant food insecurity in their foster placements, and respondent reported to a caseworker that he had previously locked KP and RP in their bedroom at night to prevent them from taking food from the kitchen. Since this Court's remand in December 2023, KP continued to demonstrate sexual behaviors that were inappropriate for a child her age, again reported to clinicians and DHHS employees that respondent had sexually abused her, and used food to demonstrate to DHHS employees what sexual acts respondent had taught her to perform on him. RP had also started exhibiting inappropriate sexual behavior in her foster home, which had increased in severity by the time of the termination hearing. Testimony further established that respondent was unable to support himself, let alone one or more of his children, given that he struggled to maintain full-time employment for any meaningful period of time, continually relied on money from his family members for basic necessities, and still lived in a one-bedroom motel room—housing he acknowledged was inappropriate for any of his children. The record reflects that the trial court considered the needs of each child when making its best-interests determination, and we see no clear error in its findings. See *id*.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Philip P. Mariani

-6-